## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**REBECCA E. GORDON,**

      **Plaintiff,**

**v.**

                                        **CIVIL ACTION NO. 3:21-CV-63**
                                        **(JUDGE GROH)**

**KILOLO KIJAKAZI,**
**Acting Commissioner of Social Security,**

      **Defendant.**

### REPORT AND RECOMMENDATION

This case arises from the denial of Plaintiff Rebecca E. Gordon's ("Plaintiff") Title II application for disability insurance benefits ("DIB"). After Plaintiff's application proceeded through the administrative process, a United States Administrative Law Judge ("ALJ"), concluded that Plaintiff was not disabled within the meaning of the Social Security Act ("the Act"). Plaintiff's request for review by the Appeals Council was denied, making the ALJ's decision the final decision of Defendant Kilolo Kijakazi, Acting Commissioner of Social Security, ("Defendant" or "Commissioner"). Now, Plaintiff seeks judicial review of Commissioner's decision.

Following a review of the parties' motions and the administrative record, because the Commissioner's final decision to deny Plaintiff's claim contains no legal error and is supported by substantial evidence, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge recommending the Plaintiff's Motion for Summary Judgment, ECF No. 18 and ECF No. 24, be **DENIED**, and Defendant's Motion for Summary Judgment, ECF No. 21 be **GRANTED**.

## I.     PROCEDURAL HISTORY

On June 14, 2019, Rebecca E. Gordon ("Plaintiff") filed a claim[1] for DIB, with an alleged onset date of disability of February 1, 2019. R. 105-106, 123, 247. Plaintiff's application for DIB was initially denied on January 13, 2020, R. 149-153, and upon reconsideration on May 4, 2020, R. 166-168. After the denials, on May 28, 2020, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). R. 173. On September 30, 2020, a hearing was held before ALJ Regina Carpenter. R. 44-77. On November 27, 2020, the ALJ issued a decision concluding that Plaintiff was not disabled within the meaning of the Act. R. 21-36.  The Appeals Council denied Plaintiff's request for review on February 24, 2021, making the ALJ's decision the final decision of the Commissioner. R. 1-5.

On April 29, 2021, Plaintiff, by counsel Brian D. Bailey, filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Kilolo Kijakazi, Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). Compl., ECF No. 1. On September 2, 2021, the Commissioner, by counsel Morgan McKee, Assistant United States Attorney, filed an answer and the administrative record of the proceedings. Answer, ECF No. 11; Admin. R., ECF No. 12.

On November 10, 2021, Plaintiff filed Plaintiff's Motion for Summary Judgment, ECF No. 18, along with Plaintiff's Brief in Support of Motion for Summary Judgment, ECF No. 18-1. On December 10, 2021, Commissioner filed her Motion for Summary Judgment, ECF No. 21, along with a Memorandum in Support of her Motion for Summary Judgment, ECF No. 21-1. Thereafter, on December 22, 2021, Plaintiff filed a Supplemental Brief, ECF No. 24, in support of her Motion for Summary Judgment.

---

[1] Plaintiff has multiple prior applications for DIB; her recent application history, which is not contested, is outlined generally in the ALJ's decision. *See* R. 21.

The matter is now before the undersigned United States Magistrate Judge for a Report and Recommendation to the District Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule of Civil Procedure 9.02(a). Having reviewed the parties' motions and the administrative record, the undersigned now issues the following Report and Recommendation.

## II.    BACKGROUND

In accordance with the Court's Order Directing Filing of Briefs, the parties were required to produce a stipulation of facts in order to provide the Court with a chronology in narrative form of Plaintiff's relevant medical history. ECF No. 13 at 2. The undersigned relies upon those parties' recitation of the facts[2] throughout this report and recommendation but, for the sake of completeness, after considering the record in full, the undersigned will highlight select factual information below.

### A. Personal History

Plaintiff Rebecca Elaine Gordon was born on August 22, 1974 and was a younger individual, age forty-four (44), on the alleged disability onset date of February 1, 2019. R. 35. On June 14, 2019, Plaintiff applied for benefits, alleging disability due to depression, ankle and back problems, anxiety disorder, migraine headaches, and thyroid disorder. R. 105-106, 123, 247-253.

During the relevant period, Plaintiff was frequently without a permanent residence; she was often described as "homeless" and ordinarily slept in her car or with relatives. R. 132, 161, 240, 242, 449, 503-504, 607-608, 615, 950, 1084, 1087, 1137, 1160, 1266, 1272, 1318, 1321, 1322, 1325, 1382, 1391, 1403, 1409, 1423, 1428, 1463, 1571, 1582, 1612, 1616, 1688, 1835, 1839, 1841, 1843, 1845, 1847, 1849, 1851, 1862, 2768, 2790, 2928, 2931, 2932, 2940, 3005, 3017, 3035, 3041. Plaintiff is single; her prior marriage ended by divorce on April 1, 2004. R. 247. Plaintiff

---

[2] *See* Pl's Brief Supp. Mot. Summ. J., No. ECF 18-1 at 6-8; Def.'s Mem. Supp. Mot. Summ. J., ECF No. 21-1 at 2-6.

has no minor children or dependents, but she does have two adult children and multiple grandchildren. R. 55, 248, 1423, 3041.

In February 2020, Plaintiff returned to work as a home health aide. R. 24, 57, 1270, 1420. However, this work performed after the Plaintiff's alleged disability onset date has not arisen to the level of substantial gainful activity. R. 24.

### B. Select Medical History

On February 2, 2019, Plaintiff visited Dr. David Watson, M.D. ("Dr. Watson") of the WVU Headache Center and reported that "her headaches have worsened." R. 524. She reported that she was having two severe headaches per week "with dizziness." *Id*. Plaintiff reported to Dr. Watson that she had one headache per day, starting "since she had some fillings put in a couple weeks ago." *Id*. It was noted that Plaintiff has "intractable chronic migraine without aura and without status migrainosus." R. 525. Dr. Watson directed that Plaintiff "continue with current medications at this time, we will consider Inderal for prevention" and nerve blocks were performed at this visit as that had "helped in the past." *Id*. It was directed that Plaintiff follow up with Dr. Watson within four to six months or sooner if needed. *Id*.

On July 15, 2019, Plaintiff underwent an assessment with Taylor Marsh, C.M., and Dennis J. Kojsza, Ph.D., Licensed Psychologist at the United Summit Center's Community Mental Health Center. R. 1280. It was reported that Plaintiff was an "active client" but that she was being "reassessed to determine diagnosis and appropriate level of treatment recommendations." *Id*. Regarding the history of the presenting problem, the providers noted,

> [Plaintiff] reports significant changes in symptoms within the past year. She notes that she has been feeling more depressed. She reports fluctuations in eating and sleeping patterns. She reports having suicidal ideation on occasion without plan or intent. She feels hopeless on a daily basis. She reports feeling worried and anxious on a daily basis. Plaintiff reports that she is currently prescribed Cymbalta by

> Michelle Ryan but does not feel that it aids in decreasing symptoms. . . . She reports
> no hospitalizations for psychiatric reasons within the year.

R. 1280. In regard to mental status, a "snapshot of the current condition," the providers wrote that

Plaintiff "was alert and oriented x4. She was friendly and cooperative. . . . Her mood was euthymic

and her affect congruent. . . . Thoughts were organized and speech was normal." R. 1281. The

providers concluded that Plaintiff "was previously diagnosed and continues to meet the criteria for

her diagnoses[;]" Major Depressive Disorder, Recurrent Episode, Moderate and Borderline

Personality Disorder. *Id*. It was recommended that Plaintiff "continue to receive medication

services for her symptoms." *Id*. It was noted that "[a]ll other services are being declined at this

time. She will be assessed annually and at critical junctures." *Id*.

A functional assessment was also administered by Taylor Marsh. C.M. during the visit. R.

1282. It was summarized that Plaintiff had "no dysfunction" in self-care due to mental illness

during the past sixty days and "no dysfunction" in community living due to mental illness during

the past sixty days. R. 1282-1283. It was determined that she has marked dysfunction in her social,

interpersonal, and family functioning in the past sixty days due to her mental illness. R. 1283. It

was further determined that Plaintiff had moderate dysfunction in her concentration and task

performance during the past sixty days. R. 1284. Lastly, it was reported that Plaintiff had no

dysfunction causing maladaptive, dangerous, or impulsive behavior due to mental illness or

substance abuse in the past sixty days. R. 1286.

On the same day, July 15, 2019, Plaintiff also met with Michelle Ryan, F.N.P.-B.C.[3]

("Nurse Practitioner Ryan" or "NP Ryan") at the United Summit Center's Community Mental

Health Center for medication management. R. 1278. Nurse Practitioner Ryan reported,

---

[3] F.N.P.-B.C. is a certification to practice as a Family Nurse Practitioner provided by the American
Nurses Credentialing Center.

> [Plaintiff] started on trial of Wellbutrin XL for depression but continues to have depressed moods, crying spells. Has had some transient [suicidal ideation] with no plan or intent. States that she does not hurt herself because she knows it would not lead to an outcome that she would want (hospitalization, bodily harm, etc.). Sleep and appetite are fair. Has been in the hospital for elevated renal function since last visit. States that is currently resolved at this time."

R. 1278. NP Ryan noted in her mental status exam that Plaintiff was alert, oriented to time, place, person, and situation, had normal speed, appropriate affect, good judgment, and good insight. R. 1279. NP Ryan further noted that Plaintiff's mood was depressed, but also noted that her behavior was normal. *Id*. NP Ryan directed that Plaintiff discontinue Wellbutrin XL and start Trintellix; NP Ryan further directed that Plaintiff call or come in if she was having any problems with the medication, otherwise Plaintiff should follow up in November 2019. *Id*.

On July 23, 2019, Plaintiff saw Dr. Watson at WVU's Headache Center for a follow-up visit. R. 968-969. During the visit, Plaintiff reported worsening headaches, including two severe headaches per week, and one headache per day. R. 968. Dr. Watson noted that Plaintiff was currently taking propranolol and nortriptyline for prevention and naratriptan as needed for headaches. *Id*. It was again noted that Plaintiff has "intractable chronic migraine without aura and without status migrainosus." R. 969. Medication was adjusted, and a follow-up visit was ordered for four to six months or sooner if needed. *Id*.

On July 30, 2019, Nurse Practitioner Ryan completed a mental capacity assessment form. R. 931-933. NP Ryan listed Plaintiff's diagnoses as Major Depressive Disorder, Recurrent, and Borderline Personality Disorder. R. 931. In regard to understanding, remembering or applying information, NP Ryan found that Plaintiff has a moderate limitation in the ability to follow one or two step oral instructions to carry out a task and marked limitations in her ability to recognize a mistake and correct it, or identify and solve problems, her ability to sequence multi-step activities, and in her ability to use reason and judgment to make work-related decisions. *Id*. Regarding

concentration, persistence, or maintaining pace, NP Ryan found that Plaintiff had moderate limitations in the ability to initiate and perform a task she knows how to do, the ability to work close to or with others without interrupting or distracting them, and the ability to work a full day without needing more than the allotted number or length of rest periods during the day. R. 932. NP Ryan found that Plaintiff had marked limitations in the ability to work at an appropriate and consistent pace, or complete tasks in a timely manner, the ability to ignore or avoid distractions while working, and the ability to sustain an ordinary routine and regular attendance at work. *Id*. In regard to adapting or managing oneself, NP Ryan found that Plaintiff has marked limitations in the ability to adapt to changes, to manage psychologically based symptoms and to make plans independently of others and moderate limitations in the ability to distinguish between acceptable and unacceptable work performance, to set realistic goals, to maintain personal hygiene and attire appropriate to a work setting, and to be aware of normal hazards and take appropriate precautions. *Id*. NP Ryan left blank the areas on the form to "[d]escribe the medical/clinical assessment that support th[ese] assessment[s]." R. 931-932.

In regard to interacting with others, NP Ryan opined that Plaintiff had marked limitations in the ability to handle conflicts with others, respond to requests, suggestions, criticism, correction, and challenges, and to keep social interactions free of excessive irritability, sensitivity, argumentativeness or suspiciousness. R. 933. NP Ryan found that Plaintiff has moderate limitations in the ability to cooperate with others or ask for help when needed and the ability to understand and respond to social cues. *Id*. To support her medical/clinical findings, NP Ryan explained that Plaintiff struggles with chronic depression, mood swings, anxiety and irritability, and has difficulty with interpersonal conflict. *Id*.

7

On August 23, 2019, registered pharmacist Shannan Molnar contacted Plaintiff regarding her monthly use of the medication Ajovy. R. 957. The diagnosis listed was "chronic migraine." *Id*. Plaintiff reported no side effects and had no questions. *Id*.

On September 18, 2019, Plaintiff underwent a "mental status evaluation" with Peggy Allman, M.A. of Phoenix Psychological and Counseling Associates, Inc. in Mount Clare, West Virginia. R. 1076-1079. Allman's listed diagnostic impressions of Plaintiff included Posttraumatic Stress Disorder, Bipolar I, Most Recent Episode Depressed, Moderate, Panic Disorder, and Attention Deficit/Hyperactivity Disorder, Primarily Inattentive Type. R. 1078. Allman noted that Plaintiff's social interaction with the examiner was within normal limits. R. 1078. For the diagnostic rationale, Allman relayed:

> [Plaintiff] reported having depression while in school with symptoms consistent with mania, primarily anger. She finds it difficult to get motivated, has low energy, feels depressed most of the time, worries, and is frequently anxious. Although she does not report symptoms of phobia, she has panic attacks which occur 5-6 times a month. As a child, she was highly inattentive, and reports being the same today with forgetfulness and constantly losing things. During the interview, she was anxious with restricted affect.

R. 1078.

Allman further noted that Plaintiff's insight, judgment, persistence, and pace were within normal limited. R. 1077-1078. Allman noted Plaintiff had some issues with memory recall and concentration – Plaintiff could only recall two of four words within immediate memory and three of four words within recent memory; Plaintiff stated she would be unable to do the serial threes test.  R. 1078. Allman reported that "[i]f awarded a benefit, the claimant is capable of managing her own finances." R. 1078.

On September 24, 2019, Plaintiff had a follow-up visit with the WVU Headache Center and reported that "her headaches have improved." R. 1145. It was noted that Plaintiff's

"[h]eadaches are less often and severe after taking ajovy, they increase in the week prior to this being due." *Id.*

On November 14, 2019, Plaintiff again visited Nurse Practitioner Ryan who remarked that she was "overall doing well with current treatment" and "doing well with Trintellix." R. 1090. Plaintiff reported to NP Ryan that "her neurologist put her on Seroquel 109 mg . . . for sleep." *Id.* NP Ryan observed that Plaintiff was alert, oriented to time, place person, and situation, and cooperative. R. 1091. NP Ryan observed that Plaintiff's mood was depressed, but also commented that her behavior was normal, her thoughts were organized, her though content was normal, her insight and judgments were good, and her memory was normal. *Id.*

On December 11, 2019, Plaintiff followed up with Dr. Watson at the WVU Headache Center. R. 1110-1111. At the visit, Plaintiff "report[ed] that her headaches have improved." R. 1110. Watson noted she was currently taking Ajovy for prevention and Naratriptan and Seroquel as needed. *Id.* Her headaches were reported at a frequency of three severe headaches per month, total headaches 4-5 per month. *Id.* Patient was directed to continue Ajovy as "she has had significant improvement in headache days[,]" "[i]ncrease Seroquel to 300 mg for sleep[,]" and "follow up . . . in 4-6 months or sooner if needed." R. 1111.

On February 6, 2020, Plaintiff had a medication management appointment with Nurse Practitioner Ryan. R. 1272. NP Ryan noted that Plaintiff's mood was stable with the current treatment, no issues with sleep or appetite. *Id.* NP Ryan remarked that Plaintiff was "not involved in therapy at this time." *Id.* NP Ryan directed that Plaintiff should continue treatment and follow up in three months. R. 1273.

On February 25, 2020, Nurse Practitioner Ryan wrote a letter to the West Virginia Department of Health and Human Resources stating that "I am writing on behalf of my client

Rebecca Gordon. Ms. Gordon has been homeless for > 1 year. Is also treated at community mental health center for major depressive d/o, severe and generalized anxiety disorder. Please consider this when evaluating for disability benefits." R. 1266.

On April 10, 2020, Plaintiff and Nurse Practitioner Ryan had a telephone encounter due to the COVID-19 pandemic. R. 1274. NP Ryan noted that sleep was still a problem at times for Plaintiff, but mostly due to Plaintiff's living situation of living in her vehicle. R. 1274. Plaintiff denied any physical complaints or medical problems. *Id*. NP Ryan directed that Plaintiff continue treatment and follow up in one month. *Id*.

On April 23, 2020, Plaintiff visited Nurse Practitioner Ryan for a medication management appointment. R. 1270. NP Ryan noted Plaintiff was having an "increase in anxiety, depression, and crying spells" after an incident at a client's home. *Id*. NP Ryan noted that Plaintiff "has been working as an in-home caregiver" and "[c]lient has a trauma hx and this has her entirely re-traumatized, unable to sleep well, anxious, crying." *Id*. NP Ryan directed that Plaintiff continue treatment, noting that Plaintiff was "agreeable to therapy by phone." R. 1271. NP Ryan noted that Plaintiff's mood was "depressed" but that her behavior was normal, affect was appropriate, thoughts were organized, though content was normal, and insight and judgment were good. R. 1271.

On May 28, 2020, Plaintiff has a phone encounter with Nurse Practitioner Ryan after Plaintiff called "stating increase in depressive symptoms." R. 1420. Plaintiff reported to NP Ryan that she "is still living in her car and working as a home health aide. . . . Was in ER about 2-3 weeks ago for acute respiratory infection. C/O some back and leg pain." R. 1420. NP Ryan explained that she discussed with Plaintiff that her "symptoms are likely to be [related] to her

situation." R. 1421. NP Ryan directed no changes in medication but would assist Plaintiff in getting

back into outpatient therapy and would plan for follow up in one month. *Id*.

On July 8, 2020, Plaintiff was seen for a telehealth therapy session with Sandra K. Jones,

M.A., L.P.C.,[4] L.S.W.,[5] A.L.P.S.[6] ("Jones") "for the first individual session since 2013, to

establish rapport and therapy plan for symptoms of depression and personality issue using CBT."

R. 1423. Jones noted that Plaintiff was "feeling more depressed," but objectively noted that

Plaintiff was "oriented to all spheres. Speech was goal directed. No overt indicators of psychotic

symptoms using CBT. She denied having thoughts of harm to herself or others. Memory was

intact." *Id*. Jones planned to call Plaintiff again in two weeks to continue their therapeutic work.

R. 1423.

On July 17, 2020, Plaintiff was seen via telehealth visit by evaluator Kimberly Vivanco,

B.S., of the United Summit Center for a reassessment to determine the appropriate level of care.

R. 1428. Regarding the history of the presenting problem, Vivanco noted that Plaintiff "reports

that she doesn't sleep well, and takes seroquil [sic] from her headache doctor to help her sleep at

night. . . . She states that her depression and anxiety are both at severe 'ups and downs.' She reports

no hallucinations, delusion, or paranoia, but believes that no one loves her or likes her. She feels

helpless and hopeless most of the time." R. 1428. Plaintiff reported to Vivanco that she "is learning

disabled and has a hard time with reading, writing and spelling. Also she has difficulty with

mathematics." R. 1429. Vivanco remarked that Plaintiff "was oriented x4. She was friendly and a

good historian of her mental health." *Id*. Vivanco recommended that Plaintiff "continue with her

current medication protocol." R. 1430.

---

[4] Licensed Professional Counselor.
[5] Licensed Social Worker.
[6] Approved Licensed Professional Supervisor.

### III. THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work…'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step

sequential evaluation process to determine if a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not disabled

at one of the five steps, the process does not proceed to the next step. *Id.*

## IV.   ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the

following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2023.

2. The claimant has not engaged in substantial gainful activity since February 1, 2019, the alleged onset date (20 CFR 404.1571).

3. The claimant has the following severe impairments: degenerative disc disease and degenerative joint disease of the lumbar spine; chronic tear of the anterior talo-fibular ligament (ATFL), peroneal tenosynovitis and peroneal tendinopathy, with split tear of the peroneus brevis of the right ankle, status post surgery in 2019; lymphedema of the lower extremities; hypertension with chronic kidney disease; migraine; obesity; major depressive disorder; borderline personality disorder; generalized anxiety disorder; and borderline intellectual functioning (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant had the residual functioning capacity to perform sedentary work as defined in 20 CFR 404.1567(a) with the following limitations: no crawling or climbing; no more than occasional balancing, crouching, kneeling or stopping; no concentrated exposure to extreme cold, wetness, vibration, and respiratory irritants; no exposure to extreme heat or hazards such as dangerous moving machinery or unprotected heights; simply routine tasks that can be learned in one moth or less; no assembly line or piecemeal production requirements; no more than occasional changes in work routine or work setting; and no contact with the public.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on August 22, 1974 and was 44 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. The claimant subsequently changed age category to a younger individual age 45-49 (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564).

13

9. Transferability of job skills of not material to the determination of disability because using the Medical-Vocational Rules as a framework supports the finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from February 1, 2019 through the date of this decision (20 CFR 404.1520(g)).

R. 21-36.

## V.       DISCUSSION

### A.  Standard of Review

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). However, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment…if the decision is supported by substantial evidence." Hays, 907 F.2d at 1456 (citing Laws, 368 F.2d at 642; Snyder v. Ribicoff, 307 F.2d 518, 529 (4th Cir. 1962)). In reviewing the Commissioner's decision, the reviewing court must also consider

whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

**B.  Contention of the Parties**

Plaintiff, in her Brief, ECF No. 18-1 at 6, asserts and alleges:

1. The ALJ failed to assess the consistency of the medical record, the Opinion of the Consultative Examiner, the Treating Source's Opinion, and the Claimant's Testimony *see Id*. at 10-16;

2. The ALJ provided a flawed credibility finding, *see Id*. at 16-17;

3. The ALJ failed to properly evaluate and consider Gordon's migraine headaches, *see Id*. at 17-21; and

4. The Commissioner of Social Security holds his office on a constitutionally illicit basis. The power of Administrative Law Judges is derived from the power of the Commissioner. As such, the Administrative Law Judge lacks authority to act on this claim. *See* <u>Id</u>. at 22-25.

Defendant, in her Memorandum in Support of the Motion for Summary Judgment, asserts that the decision is supported by substantial evidence and should be affirmed. ECF No. 21-1. Specifically, Defendant alleges that:

1. Plaintiff's separation of powers argument does not entitle her to a rehearing of her disability claim, ECF No. 21-1 at 9;

2. Substantial evidence supports the ALJ's RFC findings, *Id.* at 20-22; and

3. Substantial evidence supports the ALJ's evaluation of Plaintiff's subjective complaints. *Id.* at 22-24.

In her Supplemental Brief, ECF No. 24-1, Plaintiff responds to the Commissioner's arguments by reiterating her positions; Plaintiff argues that the ALJ failed to evaluate Plaintiff's testimony for consistency with Psychologist Allman and Nurse Practitioner Ryan's opinions, the ALJ failed to fully articulate an analysis regarding Ryan's consistency and supportability, Allman's mental status examination constitutes a medical opinion, the ALJ failed to properly consider Plaintiff's credibility and subjective complaints, the ALJ failed to properly consider Plaintiff's migraine headaches, and the Government's admitted violation of the Plaintiff's constitutional rights requires remand. ECF No. 24-1.

### C. Analysis of the Administrative Law Judge's Decision

**1. The ALJ properly assessed, considered, and weighed the medical opinions against the record.**

Plaintiff argues that the ALJ failed to provide the analysis required under the Agency's regulations, particularly in failing to properly assess the consistency of evidence. ECF No. 18-1 at 10. Defendant argues the ALJ did as was required under the regulations by evaluating the supportability and consistency of the medical opinions and prior administrative medical findings. ECF No. 21-1 at 21.

For claims filed after March 27, 2017, an ALJ must consider medical opinions pursuant to 20 C.F.R. § 404.1520c *et seq*. Most importantly, an ALJ must consider the factors of "supportability"[7] and "consistency"[8] when determining the persuasiveness of a medical opinion.

---

[7] "Supportability" is described as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).

[8] "Consistency" is described as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

20 C.F.R. § 404.1520c(b)(2) and (c). "[A]n ALJ's determination as to the weight to be assigned to a medical opinion generally will not be disturbed absent some indication that the ALJ has dredged up specious inconsistencies or has failed to give a sufficient reason for the weight afforded a particular opinion[.]" *Dunn v. Colvin*, 607 F. App'x 264, 267 (4th Cir. 2015).

While an "ALJ need not explicitly recount the details of this analysis in the written opinion," the ALJ must "give good reasons in the decision for the weight ultimately allocated to medical source opinions." *Cook v. Berryhill*, No. 2:16-CV-85, 2018 WL 1010485, at *6 (N.D.W. Va. Feb. 22, 2018)(Bailey, J.) (quoting *Taylor v. Colvin*, 2016 WL 4581338, at *4 (N.D. W.Va. 2016) (Bailey, J.)). Assignment of weight on grounds such as "the objective evidence," "the objective evidence or the claimant's treatment history," and the "objective evidence and other opinions of record" are not sufficient explanations as to why an ALJ assigns weight to particular opinions. *Monroe v. Colvin*, 826 F.3d 176, 191 (4th Cir. 2016).

Rather, the ALJ should provide a "narrative discussion" to explain why certain opinions are afforded a particular weight. *Id.* Merely stating that an opinion would receive little weight because it was inconsistent with "the objective evidence and other opinions of record," is insufficient because, "[w]ithout more specific explanation of the ALJ's reasons for the differing weights [s]he assigned various medical opinions, neither we nor the district court can undertake meaningful substantial-evidence review." *Id.* (citing *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013)).

a.  *Peggy Allman, M.A.*[9]

Plaintiff argues that the ALJ erred by failing to evaluate Allman's findings that Plaintiff would have memory issues, anger problems, or limitations in concentration. ECF No. 18-1 at 15.

---

[9] Peggy Allman, M.A., WV License #124, R. 1078, is a psychologist licensed through the state of West Virginia.

Plaintiff further argues the ALJ failed to evaluate Plaintiff's testimony for consistency with the opinion of Allman. *Id*. at 16.

Defendant argues, "[t]o the extent that Plaintiff[ ] asserts the ALJ did not properly evaluate Allman's opinion, Plaintiff is mistaken[,]" explaining that "Dr. Allman's treatment records only contained reports, findings, and assessments, none of which constitutes an opinion. ECF No. 21-1 at 22.

Plaintiff responds that Defendant's arguments lack merit; Plaintiff argues that where Dr. Allman provided a mental status examination, reached a diagnosis, evaluated persistence and pace, and considered Plaintiff's depression and judgment, the ALJ was required to fully evaluate Allman's findings and the consistency of Allman's findings as an opinion. ECF No. 24-1 at 8.

Medical opinions "are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1).[10] *See also* 20 C.F.R. § 404.1513 ("A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions[.]").

The undersigned **FINDS** that Dr. Allman's report does not qualify as a medical opinion, and the ALJ did not err by declining to weigh and analyze Allman's report as if it were a medical opinion. Allman's examination, while it listed diagnostic impressions and relayed Plaintiff's subjective complaints, did not reflect Allman's "judgments about the nature and severity" of Plaintiff's impairments, provide explanation about what Plaintiff can still do despite her

---

[10] The general definition of "medical opinion" remains listed under 20 C.F.R. § 404.1527(a)(1), even though, for claims filed after March 27, 2017, an ALJ must consider the factors listed under 20 C.F.R. § 404.1520c *et seq*. rather than those found at 20 C.F.R. § 404.1527.

impairments or elaborate on her physical or mental restrictions. Allman's remarks regarding Plaintiff's memory and mental status are similar to those remarks found throughout the record by numerous providers during routine visits; these remarks do not transform the examination notes into an opinion.

Because Allman's mental status evaluation does not qualify a medical opinion containing judgments about Plaintiff's impairments, ALJ Carpenter was not required to weigh Allman's report or consider the report's persuasiveness, specifically its consistency and supportability, as is required for medical opinions under 20 C.F.R. § 404.1520c.

    *b. Michelle Ryan, F.N.P.-B.C.*[11]

Plaintiff asserts that the ALJ analyzed Nurse Practitioner Ryan's opinion in one conclusory sentence and did not fully evaluate the record for consistency with the opinion. ECF No. 18-1 at 15. Further, Plaintiff argues Defendant failed to evaluate Ryan's opinion for consistency with the testimony of Plaintiff. *Id*. at 16. Defendant counters that the ALJ did as was required under present regulations – she "evaluated Ms. Ryan's opinion, findings that it was both not supported by and inconsistent with the record." ECF No. 21-1 at 21 (citing R. 33-34).

In her decision, the ALJ ultimately concluded that the assessments of Nurse Practitioner Ryan were "inconsistent with her treatment notes, with[ h]er conservative care, with the record as a whole and the claimant's daily activities and thus, are not persuasive." R. 34. The ALJ specifically found that "[t]he assessments of Ms. Ryan are not consistent with other assessments n the record. Additionally, Ms. Ryan supported her limitations with only one vague statement, in which she reported 'struggles with chronic depression, mood swings, anxiety, and irritability and has difficulty with interpersonal conflict.'" R. 33. The ALJ also explained that Ryan "assessed no

---

[11] *See supra* n. 2.

time frame on the proposed limitations" and while "Ryan opined that when considering disability status, the claimant's great than one year homelessness, major depressive disorder (severe), and generalized anxiety disorder should be considered," Ryan "opined to no specific functional limitations" in her February 25, 2020 letter. R. 33 (citing to R. 1266). The ALJ remarked that Plaintiff's "treatment records also do not support the severity of the limitations assessed" by Ryan. R. 34.

Here, the ALJ underwent a narrative discussion regarding why Nurse Practitioner Ryan's opinion was unpersuasive. Specifically, the ALJ support her finding that Ryan's opinion was unpersuasive by explaining that Ryan's opinions were inconsistent with her own treatment notes and conserve care plan for the Plaintiff, inconsistent with the record as a whole and Plaintiff's daily activities, supported only with one vague statement, and lacking description as to Plaintiff's functional limitations. The undersigned **FINDS** that the ALJ's determination as to the weight to be assigned to Ryan's medical opinion should not be disturbed where the ALJ provided sufficiently good reasons for the weight afforded. *See generally Dunn*, 607 F. App'x 264, 267 (4th Cir. 2015), and *Cook*, No. 2:16-CV-85, 2018 WL 1010485, at *6 (N.D.W. Va. Feb. 22, 2018)(Bailey, J.).

**2.  The ALJ properly assessed whether Plaintiff's subjective symptom statements were consistent with the medical record.**

Plaintiff argues that the ALJ failed "to consider the consistency of Gordon's statements with the medical record" and failed to provide a "analysis regarding credibility or any assessment of the medical evidence which supported her subjective complaints." ECF No. 18-1 at 17. Defendant counters that the ALJ properly considered the Plaintiff's subjective complaints regarding the nature, intensity, and severity of Plaintiff's symptoms and the impact on her ability to work. ECF No. 21-1 at 22-23. Defendant notes that the ALJ considered the Plaintiff's daily activities, the objective medical evidence, and the treatment history. *Id.* (citing R. 28-32).

As part of the RFC assessment, the ALJ must evaluate a claimant's "statements and symptoms regarding the limitations caused by her impairments." *Linares v. Colvin*, 2015 WL 4389533, at *5 (W.D.N.C. July 17, 2015) (citing 20 C.F.R. §§ 404.1529, 416.929; *Craig v. Chater*, 76 F.3d 585, 593-597 (4th Cir. 1996)). A claimant's symptoms "must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the [symptoms], in the amount and degree, alleged by the claimant." *Johnson v. Barnhart*, 434 F.3d 650, 657 (4th Cir. 2005) (quoting *Craig*, 76 F.3d at 591). There is no requirement that the ALJ reference or analyze how claimant's testimony compares to every individual item of objective medical evidence; instead, the ALJ must simply "assess whether the claimant's subjective symptom statements are consistent with the record as a whole." *Carter v. Saul*, No. CV 1:19-00191, 2020 WL 1502860, at *7 (S.D.W. Va. Mar. 30, 2020) (quoting *Vass v. Berryhill*, 2018 WL 4737236, at *6 n.4 (W.D. Va. June 12, 2018), adopted by 2018 WL 4704058 (W.D. Va. Sept. 30, 2018)). "When considering whether an ALJ's credibility determinations are supported by substantial evidence, the Court does not replace its own credibility assessments for those of the ALJ; rather, the Court studies the evidence to determine if it is sufficient to support the ALJ's conclusions." *Carter*, No. 2020 WL 1502860, at *7 (quoting *Coleman v. Colvin*, 2015 WL 764023, at *15 (S.D.W. Va. Feb. 23, 2015)).

Here, the ALJ recounted Plaintiff's testimony as follows:

The claimant testified she is able to sit for one and a half to two hours before needing to get up and move around. She testified that she is able to stand for 5-10 minutes and walk 15-20 minutes before needing to stop and rest. She testified she is unable to lift greater than 15 pounds. The claimant testified that she has swelling, numbness, tingling, and pain in the ankle. She testified that she has pain and swilling every day. She testified that she spends 2-3 hours per day elevating her legs, approximately 15 to 20 minutes at one time. She testified that kidney disease causes swelling and chest pain and causes her to go to the bathroom a lot. She testified that she uses a compression cuff for swelling, twice a day for 15 to 30 minutes. She testified that she has migraines 10 to 15 times a month with really bad

21

ones about seven times a month. She testified that medications do not help the migraines. She testified that she is homeless and that she lives in her car. She testified that she cleans up at her mother's house or in gas state bathrooms and that she does her laundry at a laundry mat. She testified that she has panic attacks 2-3 times a week, lasting 15 to 20 minutes. She testified that she has difficulties getting along with others and that she has confrontations with co-workers. She testified that she has high blood pressure that causes dizziness and tiredness, feeling like she is going to pass out three to four times a week.

R. 28-29. The ALJ went on to explain that Plaintiff's own treatment records and diagnostic tests were inconsistent with Plaintiff's allegations of back pain. R. 29. *See also Id.* ("Overall, the longitudinal medical evidence of record does not support the claimant's allegations."). Regarding the reported migraines, the ALJ wrote that "[w]hile the claimant reported some increased symptoms with changes in medication, her treatment remained only conservative. Overall, the longitudinal medical evidence of record does not support a finding of debilitation migraine condition, particularly given her work schedule of 20-25 hours a week in a caregiving capacity." R. 31. In regard to her mental health, the ALJ likewise analyzed the record and found that "the longitudinal medical evidence of record reflects a combination of underlying mental health conditions that would be expected to cause some functional limitations; however, the claimant's treatment records do not support the claimant's allegations as to severity." R. 32. The ALJ concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the . . . statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." R. 29.

Here, the ALJ thoroughly reviewed Plaintiff's subjective symptom statements – those found in her testimony and those symptoms reported to providers. The ALJ considered Plaintiff's subjective symptom statements in light of Plaintiff's ongoing treatment and the objective medical evidence found in the record. The ALJ did not provide "boilerplate language" or a "mere

summary" as Plaintiff argues. ECF No. 24-1 at 9. ALJ Carpenter fulfilled her duty by fully assessing "whether the claimant's subjective symptom statements are consistent with the record as a whole." *Carter*, 2020 WL 1502860, at *7. Accordingly, the undersigned **FINDS** that the ALJ properly assessed whether the Plaintiff's subjective symptom statements were consistent with the medical record. The undersigned further **FINDS** that the ALJ's conclusion that Plaintiff's allegations were inconsistent with the record is supported by substantial evidence.

### 3. The ALJ adequately addressed Plaintiff's migraine headaches in her decision.

Plaintiff additionally argues that the ALJ erred to adequately address Plaintiff's migraines and to consider the impact of Plaintiff's migraines alone and in combination with other impairments. ECF No. 18-1 at 21. Plaintiff specifically argues the ALJ should have considered how Plaintiff's migraines may impact workplace attendance and that failure to consider this limitation is a "harmful error of law" which merits the case be remanded for reconsideration.

Defendant argues that the ALJ "specifically addressed Plaintiff's migraine headaches and fully accounted for any functional limitations by restricting Plaintiff to unskilled, sedentary work with postural and environmental limitations." ECF No. 21-1 at 22 (citing R. 31).

Regarding Plaintiff's migraines, the ALJ wrote the following:

The medical evidence of record also indicates the claimant has a history of seeking medical treatment due to migraine headaches. Despite continued treatment of headaches, diagnostic testing has found no significant abnormalities. In fact, a March 2018 computed tomography (CT) scan of the brain found no acute intracranial process identified. Additionally, September 2018 treatment records indicate migraines were "stable" and improved with medication. On February 5, 2019, the claimant presented to the West Virginia Eye Institute with complaints of worsening headaches, having two per week with dizziness. At that time, examination was unremarkable. The assessment was intractable chronic migraine without aura and without status migrainosus. The claimant was to continue with medication management, and she received an occipital nerve block. On October 2, 2019, the claimant presented to W.V.U. medicine for follow-up treatment of migraines. At that time, the claimant reported improvement in headaches with medication management. She reported continued every day headaches, having only

23

four to five per month and three severe headaches. Subsequently, the claimant's treatment records reflect no more than conservative ongoing treatment. While the claimant reported some increased symptoms with changes in medication, her treatment remained only conservative.

R. 30-31 (internal citations omitted). The ALJ concluded this analysis by finding that "[o]verall, the longitudinal medical evidence of record does not support a finding of debilitating migraine condition, particularly given her work schedule of 20-25 hours a week in a caregiving capacity. The undersigned [ALJ] finds the above residual functional capacity accommodates the claimant's migraine condition with a reduction to unskilled sedentary exertional work with postural and environmental limitations." *Id.*

It is not the place of this Court to substitute its own judgment for that of the ALJ where the ALJ's decision is supported by substantial evidence. Hays, 907 F.2d at 1456. Plaintiff urges that the ALJ was required to provide an additional analysis as to how Plaintiff may satisfy attendance expectations considering her migraine headaches but cites to no agency regulation requiring the same and cites to a single, non-binding case from a district court within the jurisdiction of the U.S. Court of Appeals for the Seventh Circuit. ECF No. 18-1 at 21 (citing *Shulfer v. Kijakazi*, No. 20-CV-586-JDP, 2021 WL 4317043, at *1 (W.D. Wis. Sept. 23, 2021)). *Assuming arguendo*, the ALJ did thoroughly outline and consider Plaintiff's migraine headaches and treatment records and, nonetheless found that they were not debilitating, particularly given Plaintiff's ability to work twenty to twenty-five hours a week in a caregiving capacity. While the ALJ did not squarely address attendance in her decision, her analysis fully considered Plaintiff's history of treatment for migraines, Plaintiff's reported migraine worsening and improvements through treatment, and Plaintiff's recent attendance at a part-time job as a home health aide. It is clear to the undersigned that the ALJ fully considered the Plaintiff's migraine condition but ultimately found that Plaintiff

could sustain full-time work in the economy so long as it was limited to unskilled sedentary exertional work with postural and environmental limitations.

In sum, the undersigned **FINDS** that the ALJ provided the required analysis of Plaintiff's migraine headaches, and, further, the ALJ properly explained how the RFC accommodated Plaintiff's migraine condition by limiting her work to that of unskilled sedentary exertional work with postural and environmental limitations. R. 30-31.

**4. Plaintiff is not entitled to a re-hearing of her claim based upon the Act's limitation for removal of the Commissioner of the agency Defendant.**

Plaintiff argues – and Defendant does not dispute – that the provision under the Act for appointment of the Commissioner of the agency is unconstitutional to the extent which it hinders the President's ability to remove the Commissioner from their position without cause. *See* Pl's Brief Supp. Mot. Summ. J., ECF No. 18-1 at 17; Def's Mem. Supp. Mot. Summ. J., ECF No. 21-1 at 9 (citing *Constitutionality of the Comm'r of Soc. Sec.'s Tenure Prot.*, 2021 WL 2981542, (O.L.C. July 8, 2021)). Under the Act:

> The Commissioner shall be appointed for a term of 6 years, except that the initial term of office for Commissioner shall terminate January 19, 2001. In any case in which a successor does not take office at the end of a Commissioner's term of office, such Commissioner may continue in office until the entry upon office of such a successor. A Commissioner appointed to a term of office after the commencement of such term may serve under such appointment only for the remainder of such term. An individual serving in the office of Commissioner may be removed from office only pursuant to a finding by the President of neglect of duty or malfeasance in office.

42 U.S.C. § 902(a)(3) (emphasis added). This portion of the Act is in tension with Article II of the United States Constitution, which provides that "[t]he executive Power shall be vested in a President of the United States of America." U.S. Const. art. II, § 1, cl. 1. As a practical matter, the Constitutional structure is that such lesser officers aid the President in discharging executive duties. *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2197 (2020). A statute which

limits the President's ability to remove a lesser executive officer such as the Commissioner thus diminishes that officer's accountability to the President, in violation of the separation of powers requirement. Id. *See also Constitutionality of the Comm'r of Soc. Sec.'s Tenure Prot.*, 2021 WL 2981542, at *3 (O.L.C. July 8, 2021) ("To meet his 'take Care' duty, the President must have some ability to remove executive officers who the President believes are failing to satisfy the constitutional command of faithful execution of the laws.")

First, despite this constitutional defect, the undersigned finds that Defendant is correct that this is not a basis for setting aside the ALJ's decision. As Defendant convincingly notes, the ALJ in this matter was not appointed by a Commissioner who is subject to the Act's removal restriction set forth at 42 U.S.C. § 902(a)(3). Rather, the ALJ herein had her appointment ratified by an Acting Commissioner. An Acting Commissioner is removable at will, at any time, as the Act does not limit the ability to remove an Acting Commissioner as it does with a Commissioner. Thus, the portion of the Act at issue did not bear on the appointment of the ALJ herein. *See Collins v. Yellen*, 141 S. Ct. 1761, 1782 (2021) (concluding that an agency's Acting Director serves the President at-will, unlike that same agency's Director being removable "for cause" per the agency's enabling legislation, thus undercutting challengers' argument that Acting Director's actions should be set aside.) Therefore, Plaintiff cannot impute to the ALJ here the same problematic limitations that perhaps she could if the ALJ were appointed by a Commissioner who is subject to the removal restrictions.

Secondly, and perhaps more to the point, Plaintiff cannot demonstrate how she was actually harmed in this regard. Plaintiff lists six "injuries,"[12] but in fact, these are six conclusory sentences deeming the administrative process constitutionally invalid based upon the removal restriction in the Act. Even if the Commissioner (or Acting Commissioner, for that matter) is unduly protected from removal, it is unclear what compensable harm Plaintiff here suffered. There is no allegation here that the Commissioner/Acting Commissioner was improperly appointed, or that such officer exercised power that they did not have. Just because there may be an unconstitutional limit on removal of an agency head, that does not necessarily mean that the officer, otherwise duly appointed, exercised power that they did not possess, or otherwise undertook voidable actions. *See Collins*, 141 S. Ct. at 1787 ("Although the statute unconstitutionally limited the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office. As a result, there is no reason to regard any of the actions taken by the [agency] . . . as void.") (emphasis in original).

Plaintiff has not made any showing that having a Commissioner who is subject to a proper removal provision would have yielded a different result in her claim here, or any other claims, for that matter. Nor has Plaintiff made any showing that the President attempted to remove the Acting Commissioner (or Commissioner), let alone a showing that the President attempted to do so and was thwarted by the Act's limit on removal. Put another way, Plaintiff demonstrates no causal

---

[12] *See* Pl's Brief Supp. Mot. Summ. J., ECF No. 18-1 ("The first injury the claimant suffered is that she did not receive a constitutionally valid hearing and adjudication from an ALJ to which she was entitled. The second injury the claimant suffered is she did not receive a constitutionally valid decision from an ALJ to which she was entitled. The third injury the claimant suffered is that she received an unfavorable decision from this constitutionally illicit ALJ adjudication process. The fourth injury the claimant suffered is that she did not receive a constitutionally valid adjudication process from SSA's Appeals Council to which she was entitled. The fifth injury the claimant suffered is that she did not receive a constitutionally valid determination by the Appeals Council to which she was entitled. The sixth injury the claimant suffered is that she . . . received an unfavorable determination from this constitutionally illicit Appeals Council adjudication process."). *See also* ECF No. 24-1 at 14 (reiterating same injuries).

connection between the Act's limit on removal of the Commissioner and the adverse result before

the ALJ and Appeals Council below. The Supreme Court has explained that an issue such as the

one Plaintiff raises here does not necessitate reversal of agency action absent some harm.

> What we said about standing in *Seila Law* should not be misunderstood as a holding on a party's entitlement to relief based on an unconstitutional removal restriction. We held that a plaintiff that challenges a statutory restriction on the President's power to remove an executive officer can establish standing by showing that it was harmed by an action that was taken by such an officer and that the plaintiff alleges was void. But that holding on standing does not mean that actions taken by such an officer are *void ab initio* and must be undone.

Collins, 141 S. Ct. at 1788, n. 24 (citation omitted).

Here, because Plaintiff cannot demonstrate harm resulting from the removal Act's removal

provision for the Commissioner, neither vacating nor remanding the decision is inappropriate.

Courts across the country have uniformly concluded that the allegedly unconstitutional nature of

42 U.S.C. § 902(a)(3) does not require remand.[13] Consistent with *Collins* and subsequent case law,

---

[13] *See, e.g.*, *Fish v. Kijakazi*, No. 5:21CV182, 2022 WL 1504887, at *6 (N.D.W. Va. Apr. 26, 2022), report and recommendation adopted, No. 5:21-CV-182, 2022 WL 1498115 (N.D.W. Va. May 11, 2022); *Smith v. Kijakazi*, No. 7:21-CV-00059-AKK, 2022 WL 1063640, at *9 (N.D. Ala. Apr. 8, 2022)(Plaintiff failed "to demonstrate that § 902(a)(3)'s removal protection, even if unconstitutional, requires a do-over in her case."); *Nichols v. Comm'r of Soc. Sec. Admin.*, No. CV-20-08307-PCT-DLR, 2022 WL 909435, at *2 (D. Ariz. Mar. 29, 2022)("nothing about the defect in § 902(a)(3) caused Plaintiff harm"); *Linnear v. Kijakazi*, No. CV 121-098, 2022 WL 1493563, at *8 (S.D. Ga. May 11, 2022); *Dareth T. v. Kijakazi*, No. 2:20-CV-06913-AFM, 2022 WL 671540, at *3 (C.D. Cal. Mar. 7, 2022); *Toni D. v. Kijakazi*, 2022 WL 423494, at *3 (C.D. Cal. Jan. 5, 2022) ("[A]n ALJ's decision is not 'tainted' by an unconstitutional restriction on the removability of an agency official having no direct connection to the decision"); *Sean E. M. v. Kijakazi*, 2022 WL 267406, at *5 (N.D. Cal. Jan. 28, 2022) (because plaintiff failed to show connection between the unconstitutional removal provision and denial of benefits, he was not entitled to new hearing based upon constitutional challenge); *Ramos v. Comm'r of Soc. Sec.*, 2022 WL 105108, at *4 (E.D. Cal. Jan. 11, 2022); *Standifrd v. Comm'r of Soc. Sec.*, No. 20-cv-1630-GPC(BLM), 2020 WL 5634177, at *3 (S.D. Cal. Dec. 1, 2021); *Alice T. v. Comm'r Soc. Sec.*, No. 8:21-cv-14, 2021 WL 5302141, at *18 (D. Neb. Nov. 15, 2021); *Robinson v. Kijakazi*, No. 1:20-cv-00358-KDB, 2021 WL 4998397, at *3 (W.D.N.C. Oct. 27, 2021); *Katrina v. Commissioner of Social Security*, 2022 WL 190055, at *5 (S.D. Ohio Jan. 21, 2022); *Crawford v. Commissioner of Social Security*, No. 2:21-cv-726, 2021 WL 5917130, at *8 (S.D. Ohio Dec. 14, 2021); *Rhouma v. Comm'r of Soc. Sec.*, No. 4:20-cv-2823, 2021 WL 5882671, at *11 (N.D. Ohio Dec. 13, 2021); *Lisa Y. v. Comm'r of Soc. Sec.*, No. C21-5207-BAT, 2021 WL 5177363 (W.D. Wash. Nov. 8, 2021); *Catherine J.S.W. v. Comm'r of Soc. Sec.*, 2021 WL 5276522, at *8 (W.D. Wash. Nov. 12, 2021).

the undersigned **FINDS** the Commissioner's decision should be affirmed where Plaintiff Gordon cannot show a causal connection between the Act's limit on the removal of the Commissioner and her adverse results before the ALJ and Appeals Council below.

5. **Several doctrines and prudential considerations weigh in favor of denying Plaintiff's re-hearing request.**

As a final matter, the Commissioner raises four doctrines to underscore that Plaintiff's constitutional arguments do not merit relief here. After careful review, the undersigned is in agreement with the Commissioner, and memorializes those arguments here in summary fashion.

First, the harmless error doctrine applies to prevent Plaintiff's constitutional challenge. Courts have long recognized that certain defects in the law nonetheless yield harmless results which do not necessitate drastic court action. *See Sherman v. Smith*, 89 F.3d 1134, 1137 (4th Cir. 1996). Here, Plaintiff makes no showing that the Act's removal provision was fundamentally flawed such that it somehow informed or played a role in the ALJ's decision against her. Thus, Plaintiff's arguments fail.

Second, the *de facto* officer doctrine applies to preclude Plaintiff's constitutional challenge. This longstanding doctrine applies to ratify the actions of government officers whose positions may be technically defective but whose actions assure that the government operates effectively. *See Rockingham County v. Luten Bridge Co.*, 35 F.2d 301, 306-307 (4th Cir. 1929). Here, the doctrine is applicable because otherwise, Plaintiff's argument, if accepted, would upend thousands of Social Security benefits cases, to no practical end. Plus, application of the doctrine to save government action is more in question where an official's very <u>appointment</u> is in question. *Id*.; *see also Ryder v. U.S.*, 515 U.S. 177, 182-83 (1995). Here, there is no question about the Commissioner's <u>appointment</u>, but rather about the Commissioner's <u>removal</u>. This militates even more in favor of upholding agency action here. Plaintiff does not articulate any reason to throw

such a massive administrative operation into chaos for the sake of advancing these constitutional arguments. Thus, on application of the *de facto* officer doctrine, Plaintiff's constitutional arguments fail.

Third, the rule of necessity applies to disqualify Plaintiff's constitutional challenge. Under this doctrine, a judge must preside over a matter where that adjudicator and all others in the same position have the same defect in that position. *See U.S. v. Will*, 449 U.S. 200, 213-214 (1980). Here, if the ALJ deciding Plaintiff's case were to be disqualified because of Plaintiff's constitutional arguments, then all other adjudicators would be similarly disqualified. This would leave Plaintiff (and a large number of other claimants) without a forum to adjudicate their claims. As such, Plaintiff's constitutional arguments fail because of the rule of necessity.

Fourth and finally, prudential considerations bar Plaintiff's constitutional arguments. As Defendant correctly points out, if Plaintiff prevails with her constitutional arguments, that would lead to repetitious re-hearings for those whose cases already have been adjudicated by an ALJ. This, of course, would stretch agency resources and greatly delay the hearing of cases for claimants who have not yet had such review. And there is no reasonable argument that a re-hearing in Plaintiff's matter, simply because of her constitutional arguments, would result in any more effective or different outcome. The remand which Plaintiff seeks would be senseless.

Accordingly, because Plaintiff cannot demonstrate harm resulting from the removal Act's removal provision for the Commissioner, and because of other prudential considerations, Plaintiff's constitutional challenges fail, and the undersigned **FINDS** that the Commissioner's decision should be **AFFIRMED**.

## VI. RECOMMENDED DECISION

For the aforementioned reasons, the undersigned **FINDS** that the Commissioner's decision denying Plaintiff's claim for DIB does not contain legal error and is supported by substantial evidence. Accordingly, the undersigned **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, ECF No. 18 and ECF No. 24, be **DENIED**, Defendant's Motion for Summary Judgment, ECF No. 21, be **GRANTED**, the decision of the Commissioner be **AFFIRMED**, and this case be **DISMISSED WITH PREJUDICE**.

The parties shall have **fourteen (14) days** from the date of service of this Report and Recommendation within which to file with the Clerk of this Court, **specific written objections, identifying the portions of the Report and Recommendation to which objection is made, and the basis of such objection.** A copy of such objections should also be submitted to the United States District Judge. Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitation, consistent with LR PL P 12.

**Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** 28 U.S.C. §636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk of the Court is directed to provide an authenticated copy of this Report and Recommendation to counsel of record.

Additionally, as this report and recommendation concludes the referral from the District Court, the Clerk is further **DIRECTED** to terminate the magistrate judge's association with this case.

**Respectfully submitted May 24, 2022.**

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE